IN THE STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
IN THE CHARLESTON DIVISION

| | |
|---|---|
| Kristie Davis,<br><br>               Plaintiff<br><br>v.<br><br>AmeriHealth Caritas d/b/a Select Health of S.C.<br><br>               Defendant | **COMPLAINT**<br>**Disability Discrimination**<br>**Violation of the Americans with**<br>**Disabilities Act**<br><br>Case No. <u>2:17-3459-RMG-PJG</u><br><br>**Jury Trial Demanded** |

**COMPLAINT**

**COMES NOW,** Plaintiff Kristie Davis (hereinafter "Plaintiff" or "Davis"), by and through her undersigned counsel, and files this Complaint for Damages against Defendant AmeriHealth Caritas d/b/a Select Health of South Carolina, Inc. (hereinafter "AmeriHealth" or "Defendant") and respectfully shows this Court as follows:

**PARTIES**

1) Plaintiff is a resident of Charleston County, South Carolina

2) Defendant is a corporation doing business in Charleston County, South Carolina.

**JURISDICTION**

3) Plaintiff invokes the jurisdiction of this Court over a federal question pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12112 to 12117.

## VENUE

4) Venue is proper in that the unlawful employment practices herein occurred within the district and division of this Court.

## EXHAUSTION OF ADMINISTRATIVE APPEALS

5) Plaintiff timely filed a charge of discrimination against Defendant with the South Carolina Human Affairs Commission (hereinafter "SCHAC"). SCHAC issued a Right to Sue on September 1, 2017.

6) The Equal Employment Opportunity Community Commission (hereinafter "EEOC") adopted the findings of SCHAC and issued its Right to Sue letter on September 19, 2017. Plaintiff received the EEOC Right to Sue on September 26, 2017.

7) This action has been commenced within 90 days of Plaintiff's receipt of the EEOC notification of a right to sue.

## FACTUAL ALLEGATIONS

8) Defendant Select Health of South Carolina (hereinafter "Select Health"), a subsidiary of AmeriHealth Caritas (hereinafter "AmeriHealth"), provides Medicaid health plans.

9) Those plans are monitored by case managers, who oversee the services being provided to those who are insured (hereinafter "members").

10) Plaintiff, who holds a bachelors and two masters degrees in behavioral health, was first employed by Defendant as a Behavioral Health Case Manager on April 16, 2012. At that time Plaintiff notified her managers that she suffered from a serious medical condition, qualifying as a disability under the Americans with Disabilities Act, which was exacerbated by stress, but which was well-controlled.

11) In her capacity as a case manager, Plaintiff worked with members who were primarily receiving mental health care services, to ensure that they were using the services they were offered and adhering to the treatment plans developed by their providers.

12) The nature of the job requires that behavioral health case managers become familiar with the mental health care needs of the members they serve.

13) Initially Plaintiff was comfortable serving in that position, for which she was qualified and for

which she got positive reviews.

14) In January of 2013, Defendant entered into a contract with the South Carolina Department of Social Services to provide case management for foster children in the custody of the agency.

15) This dramatically increased the workload and altered the nature of cases for the behavioral health case management team.

16) Plaintiff found that the combination of the increased workload and the changed nature of the cases triggered in her an unprecedented level of stress, which exacerbated her existing disability.

17) Very soon thereafter, Plaintiff began asking her supervisors for assistance or accommodation that would allow her to manage the new circumstances or, in the alternative, help her move into another position for which she was qualified.

18) Defendant offered no meaningful assistance.

19) These requests for accommodation continued throughout 2014.

20) Plaintiff became increasingly affected by her disability.

21) By August of 2015 Plaintiff's health had substantially deteriorated and she was diagnosed by her psychiatrist with Post-Traumatic Stress Disorder.

22) On September 9, 2015, Plaintiff found it necessary to take a medical leave of absence.

23) In October 2015, while on FMLA leave, Plaintiff began asking her supervisor for assistance in developing accommodations by which she could return to work or to another position within the AmeriHealth Caritas organization, an entity that employs roughly 6,000 people.

24) She was directed to work with the AmeriHealth Leave of Absence Administrator, Jennifer Bligen (hereinafter "Bligen").

25) Thereafter, Plaintiff provided medical documentation of her disability and asked for the opportunity to discuss accommodation with her managers.

26) Bligen acknowledged she was in receipt of medical documentation of Plaintiff's health condition and restrictions and understood that these might involve adjusting the nature of the cases to which Plaintiff would be assigned.

27) Bligen was in touch with MetLife Insurance, which was handling Plaintiff's short-term disability coverage.

28) In email on December 2, 2015, Bligen told Plaintiff that she would be talking to Plaintiff's doctor would would be in touch if she needed further information.

29) In a December 16 email to Plaintiff, Bligen said, "Please do not stress over this. We want you to come back and be able to work."

30) Plaintiff consistently asked for an opportunity to discuss accommodations with her management or at least for assurance that Bligen had done so.

31) In a January 22, 2016 email to Bligen and Carolyn Hadler, Director of Human Resources for Select Health, Plaintiff again asked for an opportunity to discuss proposed accommodations with her managers. Bligen responded, "[w]e are trying to confirm your restrictions with MetLife."

32) In a January 25, 2016 email Plaintiff asked Bligen, "[A]m I employed as of today?" Without responding to that question, Bligen asked Plaintiff to participate in a January 26 conference call with Bligen and representatives from MetLife.

33) Plaintiff gathered no resolution from that conversation.

34) In a February 3, 2016 phone call, without any good faith, interactive process through which the parties might develop a reasonable accommodation, Bligen told Plaintiff that none of her proposed accommodations were acceptable and that her employment was being terminated.

35) A February 4, 2016 letter from AmeriHealth confirmed termination of employment.

## FIRST CLAIM FOR RELIEF
## DEFENDANT'S FAILURE TO ACCOMMODATE PLAINTIFF'S DISABILITY FROM 2013 UNTIL FEBRUARY OF 2016 WAS DISCRIMINATORY AND IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

36) In 2012 Plaintiff was hired by Defendant to perform a job for which she was qualified.

37) She received positive performance evaluations.

38) Plaintiff suffered from a serious health condition that constituted a disability under the Americans with Disabilities Act. The health condition was known to her supervisors.

39) However, she was able to perform all functions of the job for which she was hired without accommodation.

40) The stress associated with a change in the volume and nature of the workload created a level of stress that caused Plaintiff's disability to flare up.

41) On or about February 1, 2014, Plaintiff began requesting assistance/accommodation to alleviate the stress associated with the volume and nature of the caseload.

42) Plaintiff requested reasonable accommodations that would have made it possible for her to perform the essential functions of the job with no undue hardship to Defendant.

43) Plaintiff also requested transfer to one of many positions that came open during the subject time period, and for which she was qualified.

44) At no time did Defendant initiate, or agree to, an informal, interactive process with Plaintiff to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

45) At no time were Plaintiff's requests for assistance or accommodations granted.

46) In August of 2015 Plaintiff's continued worsening condition led to a diagnosis of Post-Traumatic Stress Disorder, a qualifying disability, which finally precluded, altogether, her ability to perform her job without accommodation.

47) Nevertheless, Defendant never permitted Plaintiff to discuss with her managers accommodations that would have made it possible to for her to perform all essential functions of the job.

48) Defendant also refused to assist Plaintiff in finding an alternative position within the company.

49) Defendant discriminated against Plaintiff on the basis of her disability in violation of the Americans with Disabilities Act, as amended.

## SECOND CLAIM FOR RELIEF
## DEFENDANT TERMINATED PLAINTIFF'S EMPLOYMENT BECAUSE OF HER DISABILITY, IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT.

50) Paragraphs 36-49 are incorporated here by reference.

51) Defendant's failure to undertake its obligations under the ADA was an act of discrimination

against Plaintiff on the basis of her disability.

52)  Defendant's termination of Plaintiff's employment because she could not execute the essential functions of the job without an accommodation was driven by illegal discrimination and served to exclude her from a job for which she was otherwise qualified.  This goes to the very heart of Title I of the Americans with Disabilities Act, the purpose of which is to eliminate discrimination against individuals with disabilities, and to ensure that disabled individuals have access to the same jobs and professional opportunities as those without disabilities.

53)  Defendant's discriminatory acts were in violation of the Americans with Disabilities Act and have caused Plaintiff substantial damages for which she is entitled to be compensated.

## **PRAYER FOR RELIEF**

Plaintiff has suffered substantial damages as a result of Defendant's discriminatory acts including, but not limited to, damage to her physical health and emotional well-being; loss of income for the period of unpaid leave and for both lost back wages and the foreseeable loss of future wages; the loss of the benefit of insurance coverage from the time of the wrongful termination of her employment to date and for the foreseeable future.  Plaintiff is also entitled to prejudgement interest and attorneys fees.  These losses are itemized, to the best of our ability at this time, as follows:

Medical out of pocket total:    $12,440.00

Medical expenses personally incurred by Plaintiff that would have otherwise been covered by insurance had she been accommodated and retained her position with Defendant corporation. These figures can be supported with documentation

Back pay 2015 @ 40%:          $  8,566.00

Gross salary, less deductions, lost in 2015 due to unpaid leave that Plaintiff had to take as a result of Defendant's failure to accommodate.

Back pay 2016 @ 40%:          $ 22,273.00

Gross salary less deductions Plaintiff would have earned in 2016 had she been accommodated. There is no reason to believe, and no evidence to support an assertion that Plaintiff would not have retained her position indefinitely.

Future pay 2017 @ 40%:        $ 22, 273.00

Gross salary less deductions Plaintiff would have earned in 2016 had she been accommodated. There is no reason to believe, and no evidence to support an assertion that Plaintiff would not have retained her position indefinitely.

6

Future pay 2018-2026:        $554,250.00

Future lost wages as there is no reason to believe, and no evidence to support an assertion that Plaintiff would not have retained her position indefinitely.

Lost Insurance Benefits:        $110,000.00

Coverage provided by Defendant which was lost following termination of employment, due to Defendant's failure to accommodate.

Emotional Distress:        $150,000.00

Plaintiff suffered increasing levels of stress, exacerbating her existing disabilities, due to Defendant's failure to accommodate her disabilities prior to Plaintiff's FMLA leave, starting in September 2015, magnified as Plaintiff was strung along about accommodations and return to work, during the months of October, November, December and January, and further exacerbated by her fear and anxiety of losing her job and, as importantly, due to her medical condition, her insurance benefits.  Medical professionals can testify to these damages.

Pain and Suffering:        $150,000.00

Plaintiffs physical and emotional health deteriorated during the period of her employment and then so severely after she was fired, that she was virtually physically incapable of functioning, dealing with crippling levels of depression, anxiety and emotional instability.  These symptoms have abated slowly over the course of the last nearly two years since her termination from employment. As of the filing of this lawsuit Plaintiff's physical and mental have improved enormously, although she continues to suffer from PTSD.  Medical professionals can testify to these damages.

**TOTAL:**                **$1,007,529.00**

Prejudgment interest        **To be determined**

Attorney's Fees        **To be determined**

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint

otherwise complies with the requirements of Rule 11.

Date of signing: December 22, 2017.

|  |  |
|---|---|
| Signature of Attorney | <u>s/ John F. Emerson</u> |
| Printed Name of Attorney | John F. Emerson |
| Bar Number | 05900jfe |
| Name of Law Firm | Emerson Law, LLC |
| Address | 2113 Middle Street, Ste. 311 |
| Telephone Number | 843/929-0606 |
| E-mail Address | john@johnemersonlaw.com |